Elliot POSTOW and Joan L. Postow,
Plaintiffs,

v.

ORIENTAL BUILDING ASSOCIA-
TION, Defendant.

Civ. A. No. 2017–73.

United States District Court,
District of Columbia.

March 14, 1975.

Benny L. Kass, Washington, D.C., for plaintiffs.

Thomas S. Jackson, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, District Judge.

This action involves purported violations of the Consumer Credit Protection Act (hereinafter "Act"), 15 U.S.C. § 1601 et seq., and Regulation Z,[1] in connection with the financing of real property. In essence, the complaint alleges that defendant wrongfully failed to disclose the cost of the owner's title insurance which it required as a condition of issuing a mortgage loan and, furthermore, that defendant wrongfully failed to make timely Truth in Lending disclosures. The matter is presently before the Court on defendant's motion for summary judgment and plaintiffs' motion and application for class action determination.

In August, 1972, plaintiffs entered into a sales contract to purchase a house in Rockville, Maryland. This contract was contingent upon plaintiffs obtaining a first deed of trust purchase money mortgage. On or about September 19, 1972, defendant, by means of a "Commitment Letter," approved plaintiffs' application for a loan. This letter set forth, *inter alia*, the following terms and conditions. Defendant agreed to lend plaintiffs the principal amount of $27,300 at 7% interest secured by a first deed of trust on the property. A mortgagee's title insurance policy issued by a title insurance company acceptable to the defendant was required. Furthermore, the "commitment and consum-

---

1. Regulation Z, found at 12 C.F.R. § 226, et seq. (1974), was promulgated by the Federal Reserve Board pursuant to its authority and obligation to implement the Act. 15 U.S.C. § 1604; *see* Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

mation of the loan transaction" was made contingent upon plaintiffs paying the principal in cash for the security property at the time of settlement. Finally, plaintiffs were required to pay a "stand-by fee" of $305.00 which would be forfeited if the loan was not consummated within the time parameters set forth in the agreement (November 6, 1972 to January 26, 1973). On September 26, 1972, plaintiffs acknowledged receipt of a copy of the commitment letter, accepted its terms and conditions, agreed, acknowledged and affirmed that the agreement was executed by them prior to the execution of the contract of indebtedness, and remitted the $305.00 stand-by fee. Plaintiffs' acceptance and remittance were received by defendant on September 28, 1972.

On November 8, 1972, approximately one hour prior to the actual settlement proceeding, plaintiffs met with a representative of defendant. At that time, defendant provided plaintiffs with a Truth in Lending disclosure statement which indicated an annual percentage rate of 7% per annum and a charge of $194.50 for title insurance premiums which was included in the amount financed but not in the "finance charge." It was at this time that plaintiffs were informed, allegedly for the first time, that defendant would require them to purchase owner's title insurance as a condition of closing the loan. Plaintiffs expressed a desire to forego this coverage but defendant's representative insisted that it was required by defendant. Plaintiffs therefore, after consulting with their counsel, purchased the additional coverage, indicating on the "Notice to Purchaser of Right to Obtain Owner's Title Insurance Policy" [2] that it was desired "insofar as it [is] required by the lender, Oriental Building Association." Plaintiffs' Exhibit F to the Complaint; Affidavit of Wendell B. Tascher, President of defendant Oriental Building Association, dated September

10, 1974. Settlement was subsequently effected at the offices of District-Realty Title Insurance Corporation in the District of Columbia.

Section 106(e) of the Act, 15 U.S.C. § 1605(e), provides:

The following items, when charged in connection with any extension of credit secured by an interest in real property, shall not be included in the computation of the finance charge with respect to that transaction:

(1) Fees or premiums for title examination, title insurance or similar purposes.

\* \* \* \* \* \*

Section 226.4(e) of Regulation Z additionally requires that the charges be "bona fide, reasonable in amount, and not for purpose of circumvention or evasion of this part." 12 C.F.R. § 226.4(e) (1974). Count I of the complaint alleges that the references to "title insurance" relate solely to mortgagee's, not owner's, title insurance and, accordingly, that defendant wrongfully failed to disclose the premium cost as part of the finance charge. In addition, this count of the complaint alleges that defendant, in requiring plaintiffs to purchase owner's title insurance, violated Maryland law, Ann.Code Md. Article 48A, § 486-1, which requires certain disclosures with respect to title insurance, and § 228(a) and (b), which proscribes "tie-in" arrangements between lenders and insurers. Thus, it is alleged that the insurance premiums were not "bona fide" and did not, therefore, fall within the exclusionary provision of 12 C.F.R. § 226.-4(e) (1974). Count II of the complaint relates to the timing of the required disclosures.

Both counts allege violations of § 129 of the Act, 15 U.S.C. § 1639, and the regulations promulgated pursuant thereto. Compensatory as well as injunctive relief is sought.

2. The execution of this document is required by Ann.Code Md. Art. 48A, § 486–1(a) and (b).

## A. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 1. COUNT I OF THE COMPLAINT

Section 106(e) of the Act, 15 U.S.C. § 1605(e), excludes fees or premiums for title insurance from the computation of a finance charge in connection with any extention of credit secured by an interest in real property. It is plaintiffs' first allegation in Count I of the complaint that this exclusion should be construed to relate solely to mortgagee's title insurance and not to owner's title insurance. Plaintiffs have failed to direct the Court's attention to any specific language in the Act, the Act's legislative history, or Regulation Z which supports such a narrow, restrictive interpretation. The Court's own investigation has likewise failed to disclose evidence supportive of such a construction.

■ In Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944), reh'g denied, 323 U.S. 809, 65 S.Ct. 27, 89 L.Ed. 645 (1944), the Supreme Court was called upon to construe a portion of the Fair Labor Standards Act exempting certain agricultural laborers within "the area of production" from the provisions of that Act. The action of the Administrator of the Wage and Hour Bureau, Department of Labor, which purported not only to designate territorial bounds for purposes of exemption but also to except establishments from such exemption according to the number of workers employed, was challenged. In overruling the Administrator's interpretation, the Court, per Frankfurter, J., stated:

> For the ultimate question is what has Congress commanded, when it has given no clue to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense. The idea which is now sought to be read into the grant by Congress to the Administrator to define 'the area of production' beyond the plain geographic implications of that phrase is not so complicated nor is

English speech so poor that words were not easily available to express the idea or at least to suggest it. After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.

*Id.* 322 U.S. at 617–618, 64 S.Ct. at 1221. That language, while obviously written in a different factual context, is nevertheless relevant here. "Title insurance," as it is generally understood, does not take on such a restrictive connotation as plaintiffs urge. It has been defined as:

> Insurance against loss or damage resulting from defects or failure of title to a particular parcel of realty, or from the enforcement of liens existing against it at the time of the insurance. This form of insurance is taken out by a purchaser of property or one loaning money on a mortgage.
>
> . . .

Black's Law Dictionary 944 (4th ed. 1968); *see also Webster's Third New International Dictionary* 2400 (3d ed. 1963) (no distinction made between mortgagee's and owner's title insurance). The term "title insurance" is not so complicated "nor is English speech so poor that words were not easily available to express the idea [plaintiffs assert] or at least to suggest it." Addison v. Holly Hill Fruit Products, Inc., *supra.* Accordingly, defendant is entitled to summary judgment and Count I of the complaint shall be dismissed insofar as it alleges liability grounded upon a construction of "title insurance" which restricts the meaning of that phrase solely to mortgagee's title insurance.

■ The second theory of the complaint's first count also relates to the Act's exclusion of title fees or premiums from the computation of a finance charge in connection with any extension of credit secured by an interest in real property. This second theory is predicated upon the added requirement of

Regulation Z that the charges, to be excludable, must be "bona fide, reasonable in amount, and not for purpose of circumvention or evasion of this part." 12 C.F.R. § 226.4(e) (1974). In their complaint, plaintiffs allege that the charges for title insurance were not bona fide because they were imposed in violation of Maryland law. Plaintiffs, however, have subsequently failed to substantiate in any manner these allegations of unlawful conduct. To the contrary, plaintiffs' own Exhibit F, attached to the complaint and entitled "Notice To Purchaser of Right to Obtain Owner's Title Insurance Policy," which was executed by plaintiffs at settlement on November 8, 1972, demonstrates compliance with Ann.Code Md. Art. 48A, § 486–1. With respect to the alleged violation of Ann. Code Md. Art. 48A, § 228(a) and (b), it is the uncontroverted sworn statement of the President of defendant that:

7. At no time did Oriental, its agents, or employees, require as a condition of making the first Deed of Trust loan to plaintiffs that they purchase title insurance from District-Realty Title Insurance Corporation, or any other given agent, broker or insurer, as proscribed by Article 486–1(a) [sic] of the Annotated Code of Maryland.

8. At no time did Oriental, its agents, or employees, solicit the purchase by plaintiffs of title insurance from any particular agent or broker as proscribed by Article 486–1(b) [sic] of the Annotated Code of Maryland.

9. At no time did Oriental, its agents, or employees, receive, directly or indirectly, any share of the insurance premiums paid by plaintiffs to District-Realty Title Insurance Corporation, or any form of inducement for referral.

Affidavit of Wendell B. Tascher, President of defendant Oriental Building Association, dated September 10, 1974, at 3. Plaintiffs apparently concede that no proscribed relationship existed between defendant and the District-Realty Title Insurance Corporation, but argue that, as a practical matter, disclosure of the added requirement of owner's title insurance on the date of settlement de facto required the borrowers to purchase that policy from District-Realty in violation of Maryland law. Plaintiffs again have submitted no evidence to substantiate this assertion. More importantly, the pertinent Maryland statutes require certain disclosures, which were made here, and proscribe certain relationships, which did not exist here. They do not proscribe the disclosure of a requirement of owner's title insurance on the date of settlement.

 Without amendment to their complaint, plaintiffs have argued in subsequent pleadings that the charge for owner's title insurance was not bona fide for other reasons: (1) the loan commitment did not require owner's title insurance; (2) the requirement was only disclosed on the date of settlement, thereby preventing the borrowers from comparing the costs of credit from other institutions in derogation of the express public policy of the Truth in Lending Act;[3] (3) the lender did not benefit from the requirement; (4) defendant, to the best of counsel for plaintiffs' knowledge, is the only local lender which requires borrowers to purchase owner's title insurance. Even assuming *arguendo* that these assertions are all true, none individually, nor all collectively, establish that the charges for owner's title insurance were not bona fide. They simply do not approach that level of conduct which constitutes bad faith, fraud or deceit.[4] The Court thus concludes that the charges for owner's title insurance herein may not be characterized as "non bona fide" in character and that defendant, therefore, is entitled to sum-

---

3. A discussion of the timing of all disclosures follows *infra*.

4. "Bona fide" is defined as "made in good faith without fraud or deceit." *Webster's* *Third New International Dictionary* 250 (3d ed. 1963).

mary judgment with respect to Count I of the complaint in its entirety.

## 2. COUNT II OF THE COMPLAINT

■ Count II of the complaint challenges the timeliness of the Truth in Lending disclosures. Section 129(b) of the Act, 15 U.S.C. § 1639(b), prescribes:

> Except as otherwise provided in this part, the disclosures required by subsection (a) of this section shall be made before the credit is extended, and may be made by disclosing the information in the note or other evidence of indebtedness to be signed by the obligor.

Regulation Z requires that disclosure be made "before the transaction is consummated." 12 C.F.R. § 226.8(a) (1974). It further provides:

> A transaction shall be considered consummated at the time a contractual relationship is created between a creditor and a customer irrespective of the time of performance of either party.

12 C.F.R. § 226.2(cc) (1974). Disclosure, therefore, must be made at a time prior to the existence of a contractual relationship between the borrower and lender. Bissette v. Colonial Mortgage Corp. of D. C., 155 U.S.App.D.C. 360, 477 F.2d 1245 (1973). Plaintiffs and defendant are in agreement that the law of the District of Columbia applies in determining whether a contractual relationship arose. They further agree, or at least defendant does not dispute, that plaintiffs' acceptance on September 26, 1972 of the offer extended in defendant's commitment letter created a binding contractual relationship between the parties.[5] Likewise, it is undisputed that full Truth in Lending disclosures were

not made until November 8, 1972. Defendant argues, however, that plaintiffs are not entitled to judgment for two reasons. First, it contends that the words "contractual relationship" as used in 12 C.F.R. § 226.2(cc) (1974) refer to the contractual relationship of indebtedness and not to the contractual relationship arising from a commitment to make a loan. Second, defendant maintains that the violation, if there was one, was not continuing in nature and, therefore, that Count II is barred by the one year statute of limitations imposed by Section 130(e) of the Act, 15 U.S.C. § 1640(e).

A close reading of the Court of Appeals decision in Bissette v. Colonial Mortgage Corp. of D.C., *supra,* is sufficient to dispose of defendant's first argument. The factual pattern arising there was remarkably similar to that confronting the Court here:

> In June of 1970 Mr. and Mrs. Calvin Bissette signed an agreement to purchase a house from the Ardon Corporation, contingent on procurement of adequate financing. On 9 September 1970 they met with an officer of Colonial Mortgage for the purpose of discussing the necessary loan. At that time they filled out an application for FHA insurance. On 23 November 1970 Colonial Mortgage notified the Bissettes that FHA had issued a firm commitment to insure suitable financing. Whether at that time Colonial Mortgage *committed itself* to issue the loan is hotly debated and was not resolved by the District Court's disposition of the case. After entering into a pre-possession agreement *with Ardon*, the Bissettes moved into the house on 2 December 1970. Finally, on 23 December 1970, 'closing' or final settlement took place. At that time full Truth in Lending Act

---

5. This contract to lend money may be characterized as an "alternate" or "option" contract with the $305.00 stand-by or commitment fee distinguished from liquidated damages because its forfeiture could be accomplished without judicial action. *See* D. Dobbs, Handbook on the Law of Remedies 823–825 (1973). Had defendant breached this contract, plaintiffs would have been entitled to money damages or, under exceptional circumstances, specific performance. *See generally* 5A A. Corbin, Corbin on Contracts § 1152 (2d ed. 1964); Restatement of Contracts § 343 (1932); 11 S. Williston, Williston on Contracts § 1411 (3rd ed. 1968).

disclosures were made and the mortgage instruments were executed. (Emphasis in original.)

*Id.* at 361, 477 F.2d at 1246. Defendant argues that support for its argument may be found in the Court's observation that the Federal Reserve Board was amending Regulation Z to require disclosure not later than 10 days prior to the date on which the customer executes the note or other evidence of indebtedness.[6] Defendant contends that the Court then reasoned that the very need for the amendment implied that disclosure was not required earlier. The Court's reasoning in this regard, however, contained a very important qualifier: "Of course, the very necessity for a proposed 'amendment' implies that the Board feels no disclosure is required prior to the date of closing (*or an earlier contract*) under current law." (emphasis added). *Id.,* 155 U.S.App.D.C. at 362, 477 F.2d at 1247. Defendant apparently characterizes as dictum the Court's reference to "an earlier contract." The Court's final

holding refutes any such characterization:

We hold that the applicable and binding regulations merely required disclosure at any time prior to the existence of a contractual relationship between borrower and lender. Since the District Court made no finding on the essential issue of when such a contract arose, we must remand for that determination and for further proceedings consistent with this opinion.

*Id.* at 363, 477 F.2d at 1248. A reading of the statement of facts recited above leads to the inescapable conclusion that the Court's later reference to "the essential issue" related to the question of whether Colonial Mortgage committed itself to issue the loan, a question which had been "hotly debated" before, but left unresolved by, the District Court. Thus, it clearly appears that the Court of Appeals in its controlling *Bissette* opinion deemed disclosure necessary prior to the creation of the contractual relationship arising from the commitment to make a loan [7] and not merely that relationship

6. References have been made by the parties in this action to certain amendments to the Truth in Lending Act found in the recently enacted P.L. No. 93–495, 88 Stat. 1500 (1974). Section 409 of that Act, entitled "Full Statement of Closing Costs," provides:

Section 121 of the Truth in Lending Act (15 U.S.C. 1631) is amended by adding at the end thereof a new subsection as follows:

'(c) For the purpose of subsection (a), the information required under this chapter shall include a full statement of closing costs to be incurred by the consumer, which shall be presented, in accordance with the regulations of the Board—

'(1) prior to the time when any downpayment is made, or

'(2) in the case of a consumer credit transaction involving real property, at the time the creditor makes a commitment with respect to the transaction.

The Board may provide by regulation that any portion of the information required to be disclosed by this section may be given in the form of estimates where the provider of such information is not in a position to know exact information.'

Unlike sections 406, 407 and 408 of that Act, which apply unless prior to the date of enactment "liability has been determined by fi-

nal judgment of a court of competent jurisdiction and no further review of such judgment may be had by appeal or otherwise," *id.* at § 408(e), section 409 does not take effect until the expiration of one year after the date of enactment. *Id.* at § 416. This amendment was "basically technical" in nature and "designed to improve the administration of the Truth in Lending Act." H. Conf.Rep't No. 93–1429, 92d Cong., 2d Sess. (1974) at 37, U.S.Code Cong. and Admin. News, 1974, p. 6152.

7. With respect to problems arising from the indefiniteness of some required disclosures prior to closing, the Court of Appeals had this to say:

Colonial Mortgage protested that any disclosure requirement before closing would be impossible to meet because the actual terms of credit would not be settled until that time. Although we are not faced with that issue here, an absence of absolute certainty on terms appears to pose no insurmountable problems because approximations are allowable where exact amounts are unavailable at the time disclosures must be made. See 12 C.F.R. § 226.6(f).

Bissette v. Colonial Mortgage Corp. of D.C., *supra* at 362 n. 4, 477 F.2d at 1247 n. 4.

arising from the contract of indebtedness.[8]

■ Having established that the Truth in Lending disclosures were required prior to the September 26, 1972 creation of a contractual relationship between the parties, the question remains whether this action, instituted on November 6, 1973, is barred by the Act's one year statute of limitations.[9] This, in turn, requires a determination of whether defendant's failure to render the required disclosures was a singular misdeed occurring on September 26, 1972, or, to the contrary, was a continuing omission and a continuing violation until November 8, 1972, when the credit was extended.

The Act's language does not disclose exactly when a violation is deemed to have occurred and legislative history is not helpful. Few reported cases have dealt with the question of whether a Truth in Lending violation is continuing in nature. One, Kristiansen v. John Mullins & Sons, Inc., 59 F.R.D. 99 (E.D.N.Y.1973), involved an action against a retail furniture chain store in which the creation of the contractual relationship between the parties occurred simultaneously with the extension of credit. There, the court recognized the existence of authority in support of the continuing violation theory of the statute of limitations relating to certain substantive classes of wrongs[10] but distinguished those cases from the one before it on the basis of a lack of any showing "that defendant continually reaped illegal benefits, or that plaintiff continually sustained injuries during the entire period covered by the contract, resulting from the failure to make the required disclosures." *Id.* at 107. Consequently, the Court concluded that, without some Congressional intent to the contrary, it should not increase the defendant's liability beyond the one year from the date of the execution of the contract. Another case, Stevens v. Rock Springs National Bank, 497 F.2d 307 (10th Cir. 1974), involved an action brought more than one year after the execution of a purchase agreement, promissory note and security agreement made in connection with the purchase of a mobile home. In this instance the Tenth Circuit concluded:

. . . we . . . agree generally with the proposition that violation of the disclosure requirements, with the possible exception of those respecting the limited right of rescission under 15 U.S.C. § 1635, occurs at a specific time from which the statute will then run. Thus it does not necessarily become a continuing failure or breach.

*Id.* at 309. Again, however, there existed no time interval between the creation of the contractual relationship between the parties and the extension of credit.

8. Defendant has cited two cases which it argues are supportive of its position. Foster v. Maryland State Savings & Loan Assoc., 369 F.Supp. 843 (D.D.C.1974); Stavrides v. Mellon National Bank & Trust Co., 353 F.Supp. 1072 (W.D.Pa.1973), aff'd, 487 F.2d 953 (3rd Cir. 1973). Both are factually distinguishable as in both cases the required disclosures were made prior to closing on the loans at issue and in neither case was an antecedent contractual relationship between the parties (based upon a commitment to make a loan or otherwise) shown to exist.

9. Section 130(e) of the Act, 15 U.S.C. § 1640(e), provides:
 Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

10. *See* Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) (Sherman Anti-Trust Act Violations); Baker v. F & F Investment, 420 F.2d 1191 (7th Cir. 1970), cert. denied, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970) (continual enforcement of an illegal contract in violation of civil rights); Katz v. N.L.R.B., 196 F.2d 411 (9th Cir. 1952) (violation of N.L.R.A.); Schokbeton Products Corp. v. Exposaic Industries, Inc., 308 F.Supp. 1366 (N.D.Ga. 1969) (Clayton Act violation); Baxter v. Curtis Industries, Inc., 201 F.Supp. 100 (N.D.Ohio 1962) (Copyright infringement).

Several other cases not involving mortgages secured by an interest in real property or a gap period between the contracting for and the extension of credit have barred without discussion of the continuing violation theory claims arising out of contracts which were executed more than one year prior to the commencement of the action. *See e.g.,* Ben v. General Motors Acceptance Corp., 374 F.Supp. 1199 (D.Colo.1974) (action alleging violations of Truth in Lending Act with respect to physical damage insurance required in connection with purchase of automobile brought one year and nine days after final renewal of policy); Alpert v. U. S. Industries, Inc., 59 F.R.D. 491 (C.D.Cal.1973) (claims arising out of execution of contracts for membership in health spa).

In Wachtel v. West, 344 F.Supp. 680, 681 (E.D.Tenn.1972), aff'd 476 F.2d 1062 (6th Cir. 1973), cert. denied. 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973), a case involving the alleged non-disclosure of credit terms in relation to a loan secured by a second mortgage on the plaintiffs' residence, the trial court found the Act to "contemplate that 'a violation' occurs at the moment a loan transaction is consummated; accordingly that the limitation of 15 U.S.C. § 1640(e) commences to run at that moment." On appeal, the Sixth Circuit framed the issue:

> The narrow question presented on appeal is whether a violation of the duty to disclose information to a borrower occurs at the time such disclosure is first required to be made, or whether it is a continuing violation until such time as the disclosure is actually made.

*Id.,* 476 F.2d at 1063. It then affirmed, holding:

> It thus appears that a credit transaction which requires disclosures under the Act is completed when the lender and borrower contract for extension of the credit. The disclosures must be made sometime before this event occurs. *If the disclosures are not made, this violation of the Act oc-*

*curs, at the latest, when the parties perform their contract.* The provisions with respect to the right of recission seem to contemplate a continuing violation when the disclosures are not made, but such is not the case when damages are sought. (emphasis added).

476 F.2d at 1065. Plaintiffs have seized upon this seeming recognition of a limited, continuing violation (between the times of execution and performance) as supportive of their position that the Count II violation herein continued until November 8, 1972. Their heavy reliance is misplaced, however, as it does not appear that a gap period between execution and performance existed in *Wachtel.* The Sixth Circuit's discussion, therefore, appears to be no more than dictum. Other statute of limitation cases involving loans secured by an interest in real property likewise have been brought more than one year after the extension of credit. *See, e. g.,* Chevalier v. Baird Savings Assoc., 371 F.Supp. 1282 (E.D.Pa.1974) (absent showing of fraud, action barred when brought more than four years after mortgage agreement executed); Munn v. American General Investment Corp., 364 F.Supp. 110 (S.D.Tex.1973)· (Action barred when brought sixteen months after consummation of loan secured by deed of trust on real property); Gillis v. Fisher Hardware Co., 289 S.2d 451 (Fla.App.1974) (counterclaim barred where asserted more than twenty-one months after contractual agreement entered into and mortgage covering appellants' home executed); Reyes v. Carver Federal Sav. & Loan Ass'n., 74 Misc.2d 323, 344 N.Y.S. 2d 501 (1973) (action by house purchasers barred where brought approximately twenty-nine months after assumption of loan).

█ It thus appears that no reported case has considered the meaning of the statute of limitations provision of the Act as applied to the circumstances here where the action was instituted more than one year after execution of the contract to make a loan but less than

one year after the extension of credit. A review of cases recognizing the continuing violation theory of the statute of limitations as related to other substantive classes of wrongs, *supra* n. 10, suggests several relevant factors which should be considered in determining whether defendant's conduct constituted a continuing violation, thereby barring application of the Act's statute of limitations. With respect to the defendant, was its misconduct in the nature of a specific, singular misdeed or, in the alternative, could it more aptly be characterized as an ongoing, improper relationship existing throughout the period between the execution of the contract and the extension of credit? If the latter characterization is more accurate, did that relationship constitute a prolonged and continuing invasion of the rights of the borrowers? *See* Baker v. F & F Investment, *supra*, 420 F.2d at 1200. From plaintiffs' point of view, did defendant's misconduct inflict upon them a continuing and accumulating harm during the ensuing forty-three days or was their injury, if suffered at all, incurred at one specific point in time? *See* Hanover Shoe, Inc. v. United Shoe Mach. Corp., *supra*, 392 U.S. at 502 n. 15, 88 S.Ct. 2224; Schokbeton Products Corp. v. Exposaic Indus., Inc., *supra*, 308 F.Supp. at 1367–1368. A final point requires consideration. While legislative purpose may not be substituted for the plain language of the statute and regulations, it may be usefully employed where, as here, a portion of the statute is ambiguous and its import unclear. *Cf.* Bissette v. Colonial Mortgage Corp. of D. C., *supra*. Section 102 of the Act, 15 U.S.C. § 1601, declares that purpose to be the assurance of "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

In light of the Act's intended purpose, the Court is of the opinion that defendant's misconduct may best be characterized as an improper relationship which continually, from execution of the contract to make a loan to performance thereof, deprived plaintiffs of their statutory right to know the credit terms of their loan. While specific harm caused by ignorance of the credit terms may have been suffered by plaintiffs when they executed the contract on September 26, 1972, they continued to suffer from an inability to readily compare various credit terms and avoid the uninformed use of credit throughout the ensuing period of time. Defendant's nondisclosure, therefore, constituted a continuing violation which existed until credit was extended on November 8, 1972. Plaintiffs' action was instituted on November 6, 1973, within one year from the date of the occurrence of the violation. It follows that Count II of the complaint is not barred by Section 130(e) of the Act, 15 U.S.C. § 1640(e), and that defendant's motion for summary judgment with respect thereto must be denied.[11]

**B. PLAINTIFFS' MOTION AND APPLICATION FOR CLASS ACTION DETERMINATION**

Pursuant to Rule 23, Fed.R.Civ.P., plaintiffs have moved that the Court determine that this action be maintained as a class action and that the class be determined to be all persons who have received loans from the defendant and who have entered into contractual relations with the defendant in the nature of a first deed of trust on their property since July 1, 1969, and within one year last passed from the institution of this action. Plaintiffs have also proposed that notice pursuant to Rule 23(c)(2), Fed.R.Civ.P., be given individually by certified mail from, and at the expense of, defendant to each member of the class within sixty (60) days from the

---

11. Plaintiffs have not as yet sought partial summary judgment with respect to Count II of their complaint. Thus, while the Court perceives "no just reason for delay," it is presently precluded from expressly directing entry of judgment in favor of plaintiffs as contemplated by Rule 54(b), Fed.R.Civ.P.

date that the membership of the class is ascertained.

P.L. No. 93-495, 88 Stat. 1500 (1974), contains certain amendments to Section 130 of the Act with respect to class actions. Specifically, section 408, in pertinent part, provides:

(a) Section 130(a) of the Truth in Lending Act (15 U.S.C. 1640(a)) is amended to read as follows:

"(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this chapter or chapter 4 of this title with respect to any person is liable to such person in an amount equal to the sum of—

"(1) any actual damage sustained by such person as a result of the failure;

"(2) (A) in the case of an individual action twice the amount of any finance charge in connection with the transactions, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000; or

"(B) in the case of a class action, such amount as the court may allow, except that as to each member of the class no minimum recovery shall be applicable, and the total recovery in such action shall not be more than the lesser of $100,000 or 1 per centum of the net worth of the creditor; and

"(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

In determining the amount of award in any class action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional."

\* \* \* \* \* \*

(e) The amendments made by sections 406, 407, and 408 shall apply in determining the liability of any person under chapter 2 or 4 of the Truth in Lending Act, unless prior to the date of enactment of this Act such liability has been determined by final judgment of a court of competent jurisdiction and no further review of such judgment may be had by appeal or otherwise.

Section 408 represents a legislative response to those judicial decisions denying the availability of class actions in Truth in Lending cases.[12] At the same time, it places an aggregate limitation on a creditor's class action liability for violations not involving actual damages, thereby mitigating the potential for enormously large recoveries that led several courts to deny class action treatment.[13]

■■ As defendant notes at page 2 of its Reply to Supplemental Memorandum in Support of Plaintiffs' Application for Class Action Determination, section 408 "by no means requires or even recommends class action, but properly leaves such determination to the sound discretion of the courts." Exercising that discretion, the Court finds that, with respect to Count II of the complaint, it appears at this time that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of both law and fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and ade-

---

12. For cases holding class action treatment to be either proper or improper, see, e. g., Katz v. Carte Blanche Corp., 496 F.2d 747, 763 n. 9 (3d Cir. 1974) (en banc), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336, 340-341 n. 13 (10th Cir. 1973).

13. See, e. g., Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y. 1972).

quately protect the interests of the class. Rule 23(a), Fed.R.Civ.P. The Court further finds, again only with respect to Count II of the complaint, that the questions of both law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3), Fed.R. Civ.P. This action, therefore, will be maintained as a class action with the class consisting of all persons who have received loans from defendant Oriental Building Association and who have entered into contractual relations with the defendant in the nature of a first deed of trust on their property since July 1, 1969, and within one year previous to November 6, 1973, the date on which this action was commenced. Once the class has been ascertained, the Court will entertain motions for appropriate orders concerning further procedures, including notice, to be followed.

In accordance with and for the reasons set forth in the foregoing memorandum, it is this 14th day of March, 1975,

Ordered, that the motion of defendant, Oriental Building Association for summary judgment be, and the same hereby is, granted insofar as it seeks dismissal of Count I of the complaint herein; and it is

Further ordered, that the motion of defendant Oriental Building Association, for summary judgment be, and the same hereby is, denied insofar as it seeks dismissal of Count II of the complaint herein; and it is

Further ordered, that Count II of the complaint herein be maintained as a class action and that the class is to consist of all persons who have entered into contractual relations in the nature of a first deed of trust on their property with and received loans from, defendant Oriental Building Association since November 6, 1972, and who were not provided with the disclosures required by the Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq., and the regulations promulgated pursuant thereto, 12 C.F.R. § 226 et. seq., prior to entering into such contractual relations with defendant Oriental Building Association.